✓ FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

8:44 am, Feb 03 2021

AT  BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ crp _____ Deputy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**707 York Road, Apt 3211, Towson, Maryland 21204** | Case No. 1:21-mj-281 TMD<br><br>**Filed Under Seal** |
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**5101 Queensberry Avenue, Baltimore City, Maryland, 21215** | Case No. 1:21-mj-282 TMD<br><br>**Filed Under Seal** |
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**3033 Spaulding Avenue, Baltimore, Maryland 21215** | Case No. 1:21-mj-283 TMD<br><br>**Filed Under Seal** |
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**2905 Fallstaff Road, Apartment 42, Baltimore, Maryland 21209** | Case No. 1:21-mj-284 TMD<br><br>**Filed Under Seal** |
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**5301 Park Heights Avenue, Units E302, E305, and E614, Baltimore, Maryland 21215** | Case No. 1:21-mj-285 TMD<br><br>**Filed Under Seal** |
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**5005 Palmer Avenue, Baltimore Maryland, 21215** | Case No. 1:21-mj-286 TMD<br><br>**Filed Under Seal** |
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**Blue Honda Accord bearing Maryland license plate 6DS2723** | Case No. 1:21-mj-287 TMD<br><br>**Filed Under Seal** |
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**Gold Toyota Camry bearing Maryland license plate 3BN4526** | Case No. 1:21-mj-288 TMD<br><br>**Filed Under Seal** |

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**Black Nissan Altima bearing a Maryland license plate 3EF9143** | Case No. __1:21-mj-289 TMD____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINT AND SEARCH WARRANTS

Your affiant, Task Force Officer (TFO) Keith Galeano, of the Drug Enforcement Agency

(DEA) being duly sworn, deposes and states as follows:

### I.  INTRODUCTION

1.      This is an Affidavit in support of a criminal complaint and arrest warrant charging

Donta MADISON a/k/a Black, 1993 year of birth,[1] with: (a) distribution and possession with the

intent to distribute 40 grams or more of a mixture or substance containing a detectable amount of

fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi); and (b) conspiracy to distribute

controlled substances, in violation of 21 U.S.C. § 846 (collectively, the **SUBJECT**

**OFFENSES**).

2.      This is also an Affidavit in support of search and seizure warrants authorizing the

search of the following locations and vehicles (collectively, the **SUBJECT PREMISES** and

**SUBJECT VEHICLES**) described more fully in Attachments A, to seize the items described in

Attachment B:

a.      **SUBJECT PREMISES 1**: 707 York Road, Apartment 3211, Towson,

Maryland 21204.  **SUBJECT PREMISES 1** is the current residence of Donta

MADISON, and a suspected stash location used by MADISON.  **SUBJECT**

**PREMISES 1** is an apartment building with secured doors. There is also access to this

---

[1] MADISON has been identified in several ways over the course of this investigation: including by physical and electronic surveillance and comparing surveillance photos of MADISON to photos maintained by the Baltimore Police Department (BPD) and DEA.

apartment, through a patio door, which MADISON has been seen on numerous occasions entering and exiting.  **SUBJECT PREMISES 1** is described in Attachment A-1.

b.     **SUBJECT PREMISES 2**: 5101 Queensberry Avenue, Baltimore City, Maryland, 21215.  **SUBJECT PREMISES 2** is another residence used by MADISON and other members of his Drug Trafficking Organization (DTO).  **SUBJECT PREMISES 2** is a two-story brick row home with a black security gate on the front door. **SUBJECT PREMISES 2** has 3 entry/exit points: the front door, the rear door, as well as a side door that is positioned on Spaulding Avenue.  **SUBJECT PREMISES 2** is described in Attachment A-2.

c.     **SUBJECT PREMISES 3**: 3033 Spaulding Avenue, Baltimore, Maryland 21215.  **SUBJECT PREMISES 3** is the residence of Rodney VALINES, and is believed to be used by VALINES to store controlled dangerous substances (CDS) and U.S. Currency. **SUBJECT PREMISES 3** is a two-story row home, with an elevated covered porch. **SUBJECT PREMISES 3** is one block from the DTO's main are of operation and distribution point for street-level CDS.  **SUBJECT PREMISES 3** is described in Attachment A-3.

d.     **SUBJECT PREMISES 4**: 2905 Fallstaff Road, Apartment 42, Baltimore, Maryland 21209.  **SUBJECT PREMISES 4** is used by the DTO to store and facilitate the sales of narcotics. **SUBJECT PREMISES 4** is an apartment occupied by Mia HARRIS. Investigators have observed MADISON go to this location just before distributing large amounts of CDS.  **SUBJECT PREMISES 4** is described in Attachment A-4.

e.      **SUBJECT PREMISES 5**: 5301 Park Heights Avenue, Units E302, E305, and E614, Baltimore, Maryland 21215.  **SUBJECT PREMISES 5** consists of three storage units within a Simply Self Storage facility, which is believed to be a stash location for MADISON. MADISON currently has unit E302, E305 and unit E614 rented and paid for through January 31, 2021.  **SUBJECT PREMISES 5** is described in Attachment A-5.

f.      **SUBJECT PREMISES 6**: 5005 Palmer Avenue, Baltimore Maryland, 21215. **SUBJECT PREMISE 6** is used by Shawn SMITH to store CDS, until needed for the distribution on the street-level for the DTO. **SUBJECT PREMISES 6** is a two story row-home with a porch. **SUBJECT PREMISES 6** is described in Attachment A-6.

g.      **SUBJECT VEHICLE 1**: Blue Honda Accord bearing Maryland license plate 6DS2723.  **SUBJECT VEHICLE 1** is registered to Destiny Nelson, and is being operated by MADISON to facilitate and traffic narcotics.  **SUBJECT VEHICLE 1** is described in Attachment A-7.

h.      **SUBJECT VEHICLE 2**: Gold Toyota Camry bearing Maryland license plate 3BN4526.  **SUBJECT VEHICLE 2** is registered to Marsha Bastfield, and is being used by VALINES to traffic and facilitate narcotics for the DTO.  **SUBJECT VEHICLE 2** is described in Attachment A-8.

i.      **SUBJECT VEHICLE 3**: Black Nissan Altima bearing a Maryland license plate 3EF9143.  **SUBJECT VEHICLE 3** is being used by SMITH to traffic and store CDS for the DTO. **SUBJECT VEHICLE 3** is described in Attachment A-9.

## II.    **AFFIANT AND EXPERTISE**

3.      I am a TFO with the DEA, and have been so since 2018.  I am currently assigned to the Baltimore District Office, Strike Force Group III, which investigates violations of federal firearms laws, violent crimes, and narcotics trafficking. I have been a member of the BPD since February 2008 and have successfully completed twenty-three weeks of training in the Baltimore City Police Academy. I also completed advanced investigative courses pertaining to Law Enforcement Intelligence Operations and Street Gangs. Prior assignments include the Criminal Investigations Division, Overdose Task Force, within the Homicide Section, the Operational Investigation Division, District Drug Enforcement Unit, District Operations, Community Stabilization Unit and uniformed patrol. I am currently assigned to the Anti-Crime Section, OCEDTF Strike Force Group III. I received approximately forty hours of entry level controlled dangerous substance (CDS) training through the Baltimore City Police Academy. Additionally, I have received over 120 hours of advanced narcotics training, through various trainings and institutions.

4.      I have participated in investigations focusing on controlled dangerous substance (CDS) trafficking, gangs, and illegal firearms.  I have conducted covert surveillance of suspected CDS traffickers, interviewed individuals involved in gangs and the CDS trafficking trade, participated in Title III wiretap investigations, participated in the execution of state and federal search and arrest warrants involving CDS traffickers and violent offenders, and participated in the seizure of numerous firearms and CDS.

5.      Through my training, education, and experience, I have become familiar with the manner in which illegal CDS and firearms are transported, stored, and distributed, and the manner in which CDS traffickers communicate with each other.  Based on my knowledge,

training, and experience, individuals involved with drug trafficking activities and illegal firearm

possession frequently use cellular telephones, social media accounts, communication devices,

and other electronic media storage to further their illegal activities.  Specifically, I know that

persons engaged in CDS trafficking use cellular telephones to coordinate with suppliers,

customers, and co-conspirators and frequently switch phones or utilize multiple cellular

telephones to evade law enforcement.

6.      The information set forth in this affidavit derives from my personal knowledge

and observations; discussions with other DEA agents, Task Force Officers and employees, other

law enforcement officers, and witnesses; and my review of police reports and public records.

Because I submit this affidavit for the limited purpose of establishing probable cause for a search

warrant, I have not included every fact known to me concerning this investigation.  Rather, I set

forth only those facts that I believe are necessary to establish probable cause.  I have not,

however, excluded any information known to me that would defeat a determination of probable

cause.

7.      Through training and experience in drug trafficking investigations and arrests, I

have become familiar with the actions, traits, habits, and terminology utilized by drug traffickers.

I am familiar with the ways in which narcotic traffickers conduct their business, including

methods of importing and distributing narcotics, money laundering, the use of cellular telephones

and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to

conduct drug transactions.  Based on this familiarization, I know the following:

a.      Drug trafficking is an ongoing and recurring criminal activity. As contrasted with

crimes against persons, which tend to be discrete offenses.  Drug trafficking is an illicit

commercial activity that is characterized by regular, repeated criminal activity;

b.      Drug traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell.  In that regard, I know that members of one cell commonly are provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization, and ultimately frustrating law enforcement efforts to dismantle the entire organization;

c.      Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators.  In addition, drug traffickers will often change their cellphones following the arrest of a member of their DTO, or at random times in order to frustrate law enforcement efforts;

d.      Drug traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies.  Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them;

e.      Drug traffickers often arm themselves and their organization to protect their drug trafficking activities from rival drug traffickers;

f.      Drug traffickers keep controlled substances, as well as paraphernalia (to include packaging materials, cutting agents, scales etc.) in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses;

g.      Drug traffickers frequently keep and maintain records of their various activities. Such records frequently are kept to keep track of money owed to them by other drug traffickers and money that they owe to drug suppliers, and to maintain contact information for other drug traffickers and suppliers.  Experience in similar cases has established that such records are frequently concealed in a suspects residence and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, and that they take various forms.  Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators.  The aforementioned items are kept in locations that are considered safe by the drug traffickers and where they have ready access to them, such as safety deposit boxes, their residences, in their vehicles and on their person;

h.      Drug traffickers, due to advancement in technology, may be utilizing computers or other electronic storage media to store the records listed above;

i.      Drug traffickers must maintain on hand large amounts of United States currency in order to maintain and to finance their ongoing narcotics business. Based on training and experience I know that persons involved in large scale drug trafficking conceal in their residences and/or curtilage, their automobiles, residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of

their drug distribution activities, such as stash houses or safe houses, currency, financial

instruments, and evidence of financial transactions relating to narcotics trafficking activities;

      j.      Drug traffickers frequently utilize cellular telephones, pagers and other electronic

communications devices to facilitate illegal drug transactions.  Documents referencing the

possession or use of cellphones, such as bills, cellphone boxes, receipts for phones or payment,

etc., are of evidential value insofar as their evidence of a suspect's possession of a particular

phone.  Moreover, the electronically stored information on these devices is of evidentiary value

in identifying other members of the drug trafficking conspiracy and establishing the relationship

between these individuals.  I know that drug traffickers often keep in their residences and/or

curtilage, their automobiles, residences of family members, friends and associates, as well as

their business locations, storage areas, and/or in the places of operation of their drug distribution

activities, such as stash houses or safe houses, cellular telephones and documents referencing the

possession of those phones;

      k.      Drug traffickers frequently take or cause to be taken photographs of themselves,

their associates, their proceeds, and their narcotics.  Drug traffickers commonly have such

photographs in their residences, vehicles, places of work, electronic devices, or on their person.

In a criminal conspiracy case such as this, photographs of co-conspirators with one another is

evidence of their association with one another and thus can be used as evidence of their

participation in a common conspiracy;

      l.      Drug traffickers commonly have in their possession -- that is, on their persons and

in their residences and/or curtilage, their automobiles, residences of family members, friends and

associates, as well as their business locations, storage areas, and/or in the places of operation of

their drug distribution activities, such as stash houses or safe houses -- firearms and other

weapons, which are used by the traffickers to protect and secure their narcotics and proceeds

from loss to law enforcement agents or to other criminals who may attempt to steal money and

drugs.

## III.    PROBABLE CAUSE TO ARREST MADISON

### A.  Case Background

8.      In March 2020, DEA and BPD investigators began investigating a suspected DTO

operating an open-air drug shop that sold heroin/fentanyl and cocaine to retail customers in and

around the 4900 block of Queensberry Avenue. After suspected DTO leader, Joshua

CARROLL, was murdered in June 2020, the DTO moved its street-level drug shop to the

intersection of Queensberry and Spaulding Avenues, approximately a block north of its original

operating area.

9.      Pursuant to this investigation, investigators have conducted physical surveillance,

obtained and analyzed toll data, used court ordered oral, wire, and electronic interception, and

used BPD Undercover Officers ("UCs") and confidential informants to conduct controlled

purchases of CDS from DTO members of this organization.

10.      Throughout this investigation, law enforcement has also used fixed video cameras

in the vicinity of the 4900 block of Queensberry Avenue, 2900 block Garrison Avenue, 2800

block of W. Belvedere Avenue, 5100 block of Queensberry Avenue and the 5000 block of

Palmer Ave to surveil MADISON and DTO members.  Investigators have regularly monitored

the video footage from these cameras or reviewed the footage from the cameras after it was

recorded.  During this surveillance, MADISON and the DTO members were observed interacting

with each other and conducting what appeared, based on investigators training, knowledge and

expertise, to be numerous, daily hand-to-hand drug transactions of suspected CDS with paying

customers. Given the close proximity of this drug activity and the way in which MADISON and

the DTO interacted and appeared to coordinate with each other, I believe, based on my training,

knowledge and expertise, that the MADISON and the DTO were working together as a unit to

operate an open-air retail drug operation in the these areas of operation.

       11.     To date, investigators have purchased or recovered over 500 grams of suspected

fentanyl and 32 grams of cocaine during the course of the investigation.  In addition,

investigators have recovered 10 firearms from at least 5 DTO members. The DTO has also been

associated with numerous acts of violence, as perpetrators and victims.  In March 2020, a double

homicide occurred at the DTO's main area of operations and was believed to have been

perpetrated by DTO members.  In June 2020, former DTO leader CARROLL was murdered at

the main intersection of the DTO's area of operation. Information gained during this

investigation, including through court-authorized interception, has also revealed that MADISON

traffics firearms as well as controlled substances.

       12.     In addition to controlled purchases, the investigation has also included

interception of communications over a telephone used by MADISON, over an Instagram account

used by MADISON, as well as communications and non-verbal conduct at locations used by

MADISON and the DTO to store narcotics.  These interceptions occurred pursuant to court

orders by the Hon. Ellen L. Hollander, U.S. District Judge for the District of Maryland, dated

July 24, 2020, September 15, 2020, October 23, 2020, November 25, 2020, and January 6, 2021.

Based on evidence gathered thus far, and as explained further below, I believe that MADISON is

the current leader of the DTO.

     **B.**     **Interdiction of Narcotics Sold by MADISON**

13.     On November 18, 2020, at approximately 12:38 p.m., investigators intercepted a

text message exchange between MADISON using assigned call number 443-418-1182 and a co-

conspirator (CC-1). The following is a transcript of that exchange:

> DM:    I'm going outta town Friday night u til Sunday you going b good? Just
>        checking
> CC-1:  Its gonna be close deffently gonna need see u wen u get back
> DM:    Ok it's up to u bro before i leave or when i come bck i rather see u before i
>        go bc i might stay longer
> CC-1:  Ok tomorrow cool?
> DM:    Yeah that's fine

14.     Based on training, experience and information gathered from the investigation to

date, investigators believe that MADISON is a supplier of CDS to CC-1, who then resells the

CDS at a profit for street-level distribution. Based on this conversation, investigators believe that

MADISON was going out of town, and, before leaving, was making sure that CC-1 had

sufficient product to last him while MADISON was away. CC-1 replied that he likely had

enough ["Its gonna be close"], but the two conspirators nonetheless agreed to meet the following

day for a suspected sale of CDS.

15.     The next day, on November 19, 2020, investigators were conducting electronic

and physical surveillance of MADISON, knowing that he and CC-1 had agreed to meet, so that

MADISON could resupply CC-1 with suspected heroin/fentanyl. Investigators then intercepted

the following text message exchange over MADISON's phone:

> DM:    Whenever u ready i am
> CC-1:  Im ready now is it still the blue?
> DM:    I had to get the white until the blue come i been waiting on that shit for
>        two weeks but this still fire so u good i promise whenever blue come u
>        know I'll swap u so it's no worries bro
> DM:    The election fucked up transport
> CC-1:  K i got 6600
> DM:    Lmk wen head out

16.     Based on training, experience and information gathered from the investigation to date, investigators know that MADISON and CC-1 were meeting with the purpose of MADISON resupply CC-1 with heroin/fentanyl. CC-1, asked MADISON if the color of the product was blue ["is it still the blue"] with MADISON replying that due to the election, transportation for the blue product was late, so he had white product that was still of high quality ["I been waiting on that shit for two weeks but this still fire so u good"].

17.     At 11:10 MADISON, left **SUBJECT PREMISES 1** in **SUBJECT VEHICLE 1**, and drove directly to **SUBJECT PREMISES 2**. While in **SUBJECT PREMISES 2**, MADISON sent CC-1 a text message that read "Come on," with CC-1 replying "On way." MADISON then exited **SUBJECT PREMISES 2**, and drove directly to and entered **SUBJECT PREMISES 4**. While inside **SUBJECT PREMISE 4**, CC-1 sent a text message to MADISON that read, "On cyl [Cylburn Avenue]" meaning that he was on Cylburn Avenue, to meet MADISON. CC-1 sent a subsequent text message that read "here." Minutes later, investigators observed MADISON leave **SUBJECT PREMISES 4**, with his hands in his hooded sweatshirt pocket. At roughly the same time he was leaving **SUBJECT PREMISES 4**, MADISON sent a text message to CC-1 that read "Ok." MADISON then drove directly to 4900 Lanier Avenue, right off of Cylburn Avenue where CC-1 had said he was located.

18.     As investigators arrived at the intersection where the meet was supposed to occur, investigators observed CC-1 leaving the area in his vehicle. Based on training, experience and information gathered from the investigation to date, as well as the sequence of events just described, investigators believed that MADISON had just resupplied CC-1 with CDS. Accordingly, investigators maintained surveillance on CC-1 and notified Baltimore County Detectives, so that they could initiate a stop and arrest of CC-1.

19.     A vehicle stop occurred, and CC-1's vehicle was searched.  Investigators

recovered 18 baggies of suspected fentanyl with an approximate total weight of 28 grams from

CC-1's shirt pocket, and 1 brick of suspected fentanyl with an approximate total weight of 245

grams from the vehicle. The brick was white in appearance, consistent with the intercepts

described above.  The substances were initially submitted to the Baltimore County Police

Department's Evidence Control for safekeeping. Subsequently, investigators retrieved the CDS

from Baltimore County, and submitted it to the Mid-Atlantic Laboratory for safekeeping and

analysis.  Lab analysis confirmed that all of the seized substances contained fentanyl.

**C. Conclusion**

20.     Based on the facts set forth above, as well as the facts set forth in the sections

below, there is probable cause to believe that MADISON possessed with the intent to distribute,

distributed 40 grams or more of a mixture or substance containing a detectable amount of

fentanyl, and conspired to distribute the fentanyl.

**IV.    PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES AND SUBJECT VEHICLES**

**A.  707 York Rd, Apartment 3211, Towson, Maryland 21204  (SUBJECT PREMISES 1)**

21.     **SUBJECT PREMISES 1** is an apartment building and the current residence of

MADISON. A subpoena to the Towson Promenade for renter information revealed a renter of

Destiny NELSON. NELSON is the girlfriend of MADISON. Additionally, **SUBJECT

VEHICLE 1,** which MADISON uses to transport and traffic narcotics, as discussed further

below, is registered in NELSON's name.

22.     On numerous occasions, investigators have conducted physical surveillance and

observed MADISON enter and exit **SUBECT PREMISES 1** through the patio door.  In

addition, monitoring of MADISON's GPS tracking data places MADISON at **SUBJECT PREMISES 1** during late night and early morning hours, which leads investigators to believe he stays at this location overnight.  Based on the foregoing, I believe that MADISON resides at **SUBJECT PREMISES 1**.

       23.     Investigators have observed MADISON leave **SUBJECT PREMISES 1**, and drive directly to several other **SUBJECT PREMISES** to retrieve CDS.  As discussed above, for example, MADISON departed **SUBJECT PREMISES 1** on November 19, 2020 before eventually meeting CC-1 to sell him bulk quantities of fentanyl.

       24.     On December 24, 2020, investigators were monitoring court-authorized GPS tracking of **SUBJECT VEHICLE 1** used by MADISON, which showed **SUBJECT VEHICLE 1** leave **SUBECT PREMISES 1**, and drive directly to **SUBJECT PREMISES 4**. Investigators currently have a CCTV camera installed in the hallway that shows the entrance to **SUBJECT PREMISES 4**. Approximately 1 minute after **SUBJECT VEHICLE 1** arrived in the parking lot of **SUBJECT PREMISES 4**, investigators observed MADISON enter the hallway of **SUBJECT PREMISES 4**.  A few minutes later, investigators observed MADISON exit **SUBJECT PREMISES 4**, with a large rectangular object in his hooded sweatshirt pocket. This object appeared heavier than a cellphone, and was very similar in shape and size to the quarter kilogram of fentanyl recovered from CC-1 that MADISON had distributed to him, as discussed above. Accordingly, investigators to believe that MADISON had driven from **SUBJECT PREMISES 1** directly to **SUBJECT PREMISES 4** to retrieve a large amount of CDS.

       25.     MADISON then left **SUBJECT PREMISE 4** and drove directly to **SUBJECT PREMISES 5**, a storage facility.  After remaining at **SUBJECT PREMISES 5** for

approximately 3 minutes, MADISON left the location in **SUBJECT VEHICLE 1** and drove

directly to **SUBJECT PREMISES 2**, which is located at the drug shop.

26.       In short, based on training, experience and information gathered from the

investigation to date, investigators believe that MADISON drove from **SUBJECT PREMISES**

**1** to **SUBJECT PREMISE 4** to retrieve a stash of CDS, and then drove to **SUBJECT**

**PREMISE 5** either to store or retrieve more CDS for distribution. After these stops,

investigators believe that MADISON brought the CDS to **SUBJECT PREMISES 2**, to be

available for the DTO to distribute when needed.

27.       MADISON also departed **SUBJECT PREMISES 1** shortly before engaging in a

controlled purchase of CDS.  In early January 2021, investigators conducted an audio-recorded

controlled purchase of fentanyl from MADISON. At the direction of investigators, a confidential

source (CS-1)[2] contacted MADISON and the two agreed to meet for the purpose of MADISON

resupplying CS-1 with fentanyl.  At this time, investigators began monitoring GPS tracking data

on **SUBJECT VEHICLE 1**. In the early afternoon, GPS data showed MADISON departing

**SUBJECT PREMISES 1**, and traveling to a stash location for the DTO. MADISON then drove

directly to **SUBJECT PREMISES 2**, where investigators were currently monitoring electronic

surveillance. At this time, investigators observed SMITH, VALINES and other individuals of the

DTO engaged in CDS activity. MADISON exited **SUBJECT VEHICLE 1**, engaged in

conversation with DTO members, and then entered **SUBJECT PREMISES 2**.

---

[2] CS-1 is currently working proactively with law enforcement in attempt to minimize his/her
exposure to forthcoming federal charges arising from illegal firearm possession and drug
distribution. CS-1 has also received compensation in exchange for his proactive work.  Through
debriefings, CS-1 has provided information that investigators have been able to corroborate fully
through investigative techniques, including surveillance and interceptions.  Additionally,
investigators believes CS-1 has been forthcoming about all of his contacts pertaining to
MADISON. CS-1 has a criminal history for CDS-Possession.

28.     Shortly thereafter, MADISON exited **SUBJECT PREMISES 2**, and drove to **SUBJECT PREMISES 4**. Investigators, began monitoring CCTV that observes the hallway where the entrance to **SUBJECT PREMISE 4** is located. While in **SUBJECT PREMISES 4**, MADISON notified CS-1 that they now could go to a predetermined meeting location.

29.     Investigators then observed MADISON exit **SUBJECT PREMISES 4**, with a bulge under his hooded sweatshirt, which investigators believe was concealing a supply of CDS. Investigators then observed MADISON leave the location, and meet CS-1 at the predetermined location. MADISON then sold an agreed upon quantity of fentanyl to CS-1 in exchange for U.S. Currency. CS-1 and MADISON then departed the area. CS-1 then relinquished custody of the CDS to investigators, who subsequently submitted the CDS to DEA's Mid-Atlantic Laboratory for safekeeping and analysis.

30.     In addition, on January 20, 2021, Investigators were monitoring visual conduct of **SUBJECT PREMISE 5**, pursuant to court authorization, when investigators saw MADISON bring a large amount of suspected CDS out of one of the storage units. MADISON then entered **SUBJECT VEHICLE 1**, and drove directly to **SUBJECT PREMISES 1**. Investigators believe MADISON brought the CDS to **SUBJECT PREMISES 1**, so that he would have a readily available amount of CDS on hand, should he need to distribute it to a wholesale buyer.

31.     As noted above, based on my training and experience and my participation in this and other investigations, I know that drug traffickers frequently store certain items, such as documents, records, firearms, narcotics, narcotics proceeds at their residences or in their vehicles.  Given the evidence of MADISON's involvement in a narcotics trafficking conspiracy, and the fact that MADISON has travelled directly to or from **SUBJECT PREMISES 1** to or from the DTO's area of operation in connection with CDS distribution, I respectfully submit that

there is probable cause to believe that that the items set forth in Attachment B will be found in **SUBJECT PREMISES 1**.

**B. 5101 Queensberry Avenue, Baltimore, Maryland 21215 (SUBJECT PREMISES 2)**

32.     **SUBJECT PREMISES 2** is a rental property and a second residence of MADISON's located near the drug shop, which investigators believe the DTO is utilizing to store CDS.  On numerous occasions, investigators have observed MADISON and other DTO members entering and exiting **SUBJECT PREMISES 2**.

33.     A check of Maryland's Department of Assessments and Taxation shows MADISON as the listed owner of **SUBJECT PREMISES 2**. Additionally, these records show that MADISON purchased **SUBJECT PREMISES 2** from VALINES in 2019.

34.     Throughout this investigation, investigators have observed various DTO members, to include senior lieutenant Damian TAYLOR and others, entering and exiting **SUBJECT PREMISES 2**, which is in close proximity to the drug shop. Throughout January 2021, investigators have routinely observed MADISON and co-conspirators inside **SUBJECT PREMISES 2**.

35.     Investigators believe that MADISON and the DTO uses **SUBJECT PREMISES 2** to store and facilitate the distribution of CDS to various individuals, including paying customers and wholesale re-distributors.  As discussed above, on November 19, 2020, MADISON drove to **SUBJECT PREMISES 2** before eventually meeting CC-1 to conduct a sale a bulk quantities of fentanyl. On December 24, 2020, investigators believe MADISON brought CDS to **SUBJECT PREMISES 2**, to be available for the DTO to distribute when needed.  And as described above, MADISON was seen entering **SUBJECT PREMISES 2**, before eventually meeting CS-1 to conduct the controlled purchase of fentanyl.

36.    Additionally, on January 19, 2020, investigators through the use of electronic surveillance, observed MADISON meet with an unknown male (the UM) at **SUBJECT PREMISES 2**. Investigators further observed MADISON and the UM then drove in separate vehicles to **SUBJECT PREMISES 5**.  Through court-authorized CCTV intercepts, MADISON was observed entering **SUBJECT PREMISES 5** and recovering a large amount of suspected CDS. MADISON then gave this CDS to the UM. Investigators were also utilizing Baltimore City's CCTV system, and observed the UM's vehicle leave the parking lot of **SUBJECT PREMISES 5**, and drive northbound. GPS tracking data showed MADISON then returned to **SUBJECT PREMISES 2**, where with the use of electronic surveillance, investigators observed MADISON enter **SUBJECT PREMISES 2**.

### C.  3003 Spaulding Avenue, Baltimore, Maryland 21215 (SUBJECT PREMISES 3)

37.    **SUBJECT PREMISES 3** is a row home with a security gate, the residence of VALINES, and a suspected stash location used by the DTO.

38.    Throughout this investigation, with the use of electronic and physical surveillance, investigators have observed VALINES entering and exiting **SUBJECT PREMISES 3** freely, which leads investigators believe that VALINES lives at **SUBJECT PREMISE 3**. Additionally, investigators have observed **SUBJECT VEHICLE 2**, which is regularly being used by VALINES, consistently parked in front of **SUBJECT PREMISES 3** in the late evening hours, as well as early morning hours, which leads investigators to believe that VALINES stays at this location overnight. **SUBJECT PREMISES 3** is also within a half of block of the DTO's main area of street-level distribution, making it a useful stash location.

39.    The investigation has established that VALINES is a street lieutenant of the DTO who oversees day-to-day operations at the drug shop.  Valines is responsible for bringing the

morning supply of CDS to the drug shop to be distributed. During this investigation,

investigators have used physical surveillance and court-authorized GPS tracking data on

**SUBJECT VEHICLE 2**, discussed further below, to establish the following pattern: VALINES

leaves **SUBJECT PREMISES 3**, enters **SUBJECT VEHICLE 2**, drives approximately one

block to where the DTO distributes CDS, and stores a daily stash of suspected CDS in a drain

pipe. Surveillance has established that the DTO does not open for street-level distribution until

VALINES brings the daily stash to the DTO from **SUBJECT PREMISES 3** for it to be

distributed. VALINES has been conducting this exact pattern over a period of several months,

with VALINES arriving at the DTO between 8:00 a.m. and 8:10 a.m., to set up the DTO's daily

operations.

      40.     On January 21, 2021, investigators set forth to conduct a controlled purchase from

the Queensberry DTO with a BPD undercover officer (UC-1).  UC-1 was deployed to the

intersection of Queensberry and Spaulding Avenues. Upon UC-1's arrival into the block, he/she

engaged in CDS related conversation with VALINES. UC-1 then advised VALINES that he/she

wanted to purchase 50 units of fentanyl. VALINES advised that he was waiting for another

individual to arrive with the CDS.  VALINES then advised UC-1 to come back in 30 minutes to

conduct the purchase. UC-1 then left the area. Investigators then monitored electronic

surveillance. A short time later, SMITH arrived to the shop, and UC-1 was then deployed back to

the block. UC-1 again entered the block and this time engaged in a CDS related conversation

with SMITH. UC-1 then asked SMITH if he had the 50 units available for sale, with SMITH also

advising UC-1 to come back a little later, stating that he only had 20 units available.

      41.     At this time, investigators were conducting surveillance on **SUBJECT**

**PREMISES 3** and observed VALINES walk towards **SUBJECT PREMISES 3**, and enter the

alley adjacent the residence. Investigators believe that, at this time, VALINES entered the rear of

**SUBJECT PREMISES 3**. UC-1 then reentered the block, for the third time, where he/she

engaged in conversation with SMITH and Jaqwuan OWENS. UC-1 again advised that he/she

wanted 50 units of fentanyl. SMITH appeared to be waiting for the rest of the CDS to be brought

to the drug shop so that they could distribute it to UC-1. While waiting, investigators observed

VALINES exit the front of **SUBJECT PREMISES 3**, with his hands in his hooded sweatshirt,

which investigators believe was to conceal CDS, and walk towards the DTO's drug shop.

Investigators who were monitoring electronic surveillance, then observed OWENS walk in the

direction of VALINES, as if he were going to retrieve the CDS needed to sell to UC-1.

Investigators momentarily lost sight of OWENS and VALINES. OWENS then emerged back in

view of investigators and walked directly to UC-1, where he was joined by SMITH. OWENS

then handed UC-1 50 red jugs of fentanyl, and UC-1 handed SMITH $1,000. UC-1 then departed

the area. Investigators then observed VALINES enter the block, and walk immediately to his

vehicle. The purchased CDS was then submitted to DEA's Mid-Atlantic Laboratory for analysis

and safekeeping.  Based on the sequence of events above, investigators believe VALINES

retrieved a stash of CDS from **SUBJECT PREMISES 3**, and handed that CDS to OWENS,

who, in turn, sold the CDS to UC-1.

     42.    In addition, on October 2, 2020, members of Central District Detective Unit were

conducting an investigation in reference to a shooting investigation involving VALINES's son.

Investigators executed a search and seizure warrant on **SUBJECT PREMISES 3** and recovered

50 blue jugs of fentanyl. They also found a large amount of U.S. currency.

43.     Based on the foregoing, I believe that MADISON and his DTO use **SUBJECT PREMISES 3**, which is VALINES residence, as a stash house where they keep narcotics and store daily proceeds earned from the distribution of CDS.

### D.  2905 Fallstaff Road, Apartment 42, Baltimore, Maryland 21209 (SUBJECT PREMISES 4)

44.     **SUBJECT PREMISES 4** is a suspected stash location used by MADISON. **SUBJECT PREMISES 4** is on the 4th floor of an apartment complex. According to the corporate office overseeing **SUBJECT PREMISES 4**, the apartment was registered to Mia Harris.

45.     On more than a dozen occasions, investigators have observed MADISON travel to the building where **SUBJECT PREMISES 4** is located, which investigators believe is being used to store large amounts of fentanyl. Investigators eventually installed a CCTV camera on the fourth floor of the building, and observed MADISON enter **SUBJECT PREMISES 4** on at least five occasions.  For example, during the month of January 2021, investigators were conducting a controlled purchase of fentanyl from MADISON, as described above. During this time, investigators were actively monitoring a CCTV camera, placed within the hallway that observes where **SUBJECT PREMISES 4** is located. GPS tracking information and CCTV surveillance revealed that MADISON drove to and entered **SUBJECT PREMISES 4** before the controlled purchase.  While inside **SUBJECT PREMISES 4**, MADISON notified CS-1 that they could now meet at the predetermined location. MADISON then left **SUBJECT PREMISES 4**, and drove directly to the predetermined location and distributed 120 grams of fentanyl to CS-1. Accordingly, investigators believe that MADISON traveled to and entered **SUBJECT PREMISES 4** to retrieve fentanyl to distribute to CS-1.

46.    Additionally, through the use of CCTV that observes the entrance of **SUBJECT PREMISES 4**, investigators have observed MADISON enter this location, without having to be let in, which leads investigators to believe that he has free access to enter and exit this location at will. MADISON's frequent trips and brief durations at **SUBJECT PREMISES 4**, in conjunction with the controlled purchase described above, are indicative of a drug trafficker traveling to a main stash house to either drop off a bulk supply of CDS, or obtain a bulk supply of CDS for sale.

**E.  5301 Park Heights Avenue, Units E302, E305, and E614, Baltimore, Maryland 21215 (SUBJECT PREMISES 5).**

25.    **SUBJECT PREMISES 5** is another stash location used by MADISON. **SUBJECT PREMISES 5** is a multi-unit and multi-level storage facility. Investigators have obtained renter records for the storage units, which indicate that MADISON has currently paid for the rental of units E302, E305, and E614 through January 31, 2021.

26.    During this investigation, investigators have observed, via court-authorized CCTV monitoring, MADISON and co-conspirators going to **SUBJECT PREMISE** S**5** over a dozen times to pick up a bulk supply of suspected CDS for distribution.   For example, on October 1, 2020, investigators were monitoring **SUBJECT PREMISES 5**, when investigators observed MADISON and Larry GREEN arrive and enter unit E305. Upon exiting the unit, GREEN appeared to place a small rectangular object, roughly the shape and size of a quarter kilogram of CDS, in a pocket. Investigators believed this object to be a quarter kilo of fentanyl.

27.    On November 27, 2020, at approximately 3:26p.m., MADISON and another male arrived at **SUBJECT PREMISES 5** and went to unit E305. MADISON, who was wearing a backpack then entered the unit, while the male waited outside. MADISON was then in the unit for a couple of minutes. Upon exiting the unit, MADISON no longer had the backpack.  The two then

removed dirt bikes from the unit, and left the location.  Investigators did not capture MADISON

and the male returning to the unit. Investigators believe that when MADISON went to the location,

he retrieved or deposited CDS, which he typically carries in a backpack.

28.    Additionally, through interceptions, investigators learned that MADISON had

given the address of **SUBJECT PREMISES 5** to multiple individuals to meet him there to

obtain a supply of CDS. For example, on January 14, 2021, through interceptions over

MADISON's telephone, investigators learned that MADISON agreed to meet UM-1765 for the

purposes of resupplying UM-1765 with CDS. Following the intercepts, investigators then began

monitoring GPS tracking on **SUBJECT VEHICLE 1**. After agreeing to meet UM-1765,

MADISON drove to **SUBJECT PREMISES 5**, where investigators were monitoring court-

authorized CCTV intercepts. Investigators observed MADISON enter unit E302, and

approximately two minutes later, exit with a large sized trash bag, which was weighted down.

MADISON then re-entered **SUBJECT VEHICLE 1** and drove directly to **SUBJECT

PREMISES 2**. Investigators who were conducting electronic surveillance of **SUBJECT

PREMISES 2** then observed MADISON carry the trash bag containing suspected CDS from

**SUBJECT VEHICLE 1** into **SUBJECT PREMISES 2**. Later, investigators observed

MADISON exit **SUBJECT PREMISES 2** with what appeared to be bulk CDS stored under his

hooded sweat shirt. MADISON then entered **SUBJECT VEHICLE 1**, and traveled to meet

UM-1765. Due to heavy traffic and police presence at their predetermined meeting location,

MADISON and UM-1765 then drove to a parking lot in the 900 block of Caton Avenue. With

the assistance of video recorded aerial surveillance, investigators then observed MADISON exit

**SUBJECT VEHICLE 1**, and hand a large object of suspected CDS to UM-1765. After

conducting the hand-to-hand transaction, MADISON and UM-1765 both departed the area in

separate directions. Investigators attempted to conduct a vehicle stop of UM-1765 and the accompanying passenger, but the vehicle fled. While fleeing, UM-1765 and the passenger discarded a large heat sealed bag containing approximately one pound of marijuana from the vehicle, which investigators were able to seize.

29.      Again, on January 22, 2021, investigators were monitoring court-authorized CCTV of **SUBJECT PREMISES 5**, when, at approximately 10:12 p.m., investigators observed MADISON arrive from the far end of the hallway where his units are located. MADISON walked to unit E302 carrying an empty bag under his arm. MADISON unlocked the unit, entered, and shut the door behind him. Approximately one minute later, MADISON exited the unit, now holding a black duffle bag that was fully weighted, believed to contain CDS. MADISON then exited **SUBJECT PREMISE 5**.

### F.  5005 Palmer Avenue, Baltimore, Maryland 21215 (SUBJECT PREMISES 6)

47.      **SUBJECT PREMISES 6** is the residence of SMITH, and is believed to be used by SMITH to store additional CDS for the DTO until needed for street-level distribution. Investigators believe that SMITH and VALINES are the two DTO members primarily responsible for opening the drug shop for distribution and overseeing its operation.  Indeed, investigators routinely have observed SMITH arrive at the intersection of Queensberry and Spaulding Avenues, where the drug shop operates, shortly after VALINES arrives to open the shop. SMITH will park **SUBJECT VEHICLE 3** on the northwest corner of the intersection, almost in the same exact spot each day.  SMITH will then exit the vehicle, engage with VALINES, and then, continually throughout the day, distribute CDS to paying customers from various ground stashes, to include ground stashes placed in the wheel well of **SUBJECT**

**VEHICLE 3**. Investigators have observed SMITH conduct this exact pattern daily over the past several months.

48.     **SUBJECT PREMISES 6** is approximately 1 block west of the DTO's main area of street-level distribution, which makes it a desirable stash location for the DTO. Throughout this investigation, investigators have observed **SUBJECT VEHICLE 3**, previously used by SMITH, parked in front of this location. **SUBJECT VEHICLE 3** also has a listed address of **SUBJECT PREMISES 6**. Additionally, at times of arrest, SMITH has provided **SUBJECT PREMISES 6** as his primary residence.

49.     Routinely, investigators have observed SMITH, enter and exit **SUBJECT PREMISES 6** on numerous occasions.  For example, on January 14, 2021, investigators were conducting electronic surveillance of both the DTO at the intersection of Queensberry and Spaulding Avenue and of **SUBJECT PREMISES 6**. While conducting this surveillance, investigators observed SMITH and other DTO members engaged in CDS activity, such as hand-to-hand transactions. At approximately 9:56 a.m., investigators observed SMITH enter **SUBJECT VEHICLE 3**, and drive to the 5000 block of Palmer Ave.

50.     During this time, investigators watched SMITH enter **SUBJECT PREMISES 6**, as well as another address believed to be 5017 Palmer Ave. After exiting **SUBJECT PREMISES 6**, SMITH walked to the rear of a white Infiniti.  Investigators believe that SMITH was placing or retrieving suspected CDS from the Infiniti. SMITH then walked back into **SUBJECT PREMISES 6**. SMITH then returned to the rear of the Infiniti a second time, before returning to **SUBJECT VEHICLE 3** and driving away from the area. Investigators then observed SMITH arrive the intersection of Queensberry and Spaulding Avenues, where the DTO operates. Moments later, SMITH exited **SUBJECT VEHICLE 3**, walked to the rear of it, and

placed a suspected stash of CDS on the ground or in the wheel well, consistent with his established pattern. Continued observations showed SMITH going to and from this stash to distribute suspected CDS to numerous buyers.  Based on these sequence of events, investigators believe that SMITH went to **SUBJECT PREMISES 6** to re-supply CDS to the DTO to be distributed on the street-level.

### G.  Blue Honda Accord bearing Maryland license plate 6DS2723 (SUBJECT VEHICLE 1)

51.    **SUBJECT VEHICLE 1** is a blue Honda Accord Maryland license plate 6DS2723. This vehicle is registered to Destiney NELSON, and operated by Donta MADISON to facilitate and traffic narcotics and firearms for his DTO.  MADISON has been seen driving this vehicle daily during surveillance. Further, for the reasons detailed above, on January 8, 2021 MADISON brought a resupply of narcotics to CS-1 using **SUBJECT VEHICLE 1**, and investigators have observed MADISON using **SUBJECT VEHICLE 1** to conduct meetings and traffic CDS for his DTO, as described above.

### H.  Gold Toyota Camry bearing Maryland license plate 3BN4526 (SUBJECT VEHICLE 2)

52.    **SUBJECT VEHICLE 2** is registered to Marsha Bastfield, and is being used by Rodney VALINES to traffic and facilitate narcotics.  For the reasons fully detailed above, over the past several months, investigators have observed VALINES on a daily basis using **SUBJECT VEHICLE 2** to bring stashes of CDS from his house to the DTO to be distributed on the street-level. Every morning, after his arrival to the DTO in **SUBJECT VEHICLE 2**, Valines will exit **SUBJECT VEHICLE 2** and place a ground stash of CDS in a drain pipe, directly next to **SUBJECT VEHICLE 2**'s tire. This exact pattern has occurred almost daily over the past several months.

53.    For example, on December 31, 2020, investigators were conducting surveillance of **SUBJECT PREMISES 3**, when investigators observed VALINES exit from the rear of **SUBJECT PREMISES 3** and enter **SUBJECT VEHICLE 2**. VALINES, then drove directly to the DTO's area of operation. As VALINES arrived at the location, he exited **SUBJECT VEHICLE 3**, where he was engaged by an unknown female buyer. After engaging in conversation, VALINES removed a clear bag containing CDS from his jacket pocket, and distributed an unknown amount of suspected CDS to the unknown female. After conducting this sale, VALINES placed the plastic bag containing CDS in the drain hold next to **SUBJECT VEHICLE 3**.

54.    On January 15, 2021, investigators again observed VALINES arrive to the DTO in **SUBJECT VEHICLE 2**. A short time later, UC-1430 was deployed to the area to conduct a controlled purchase from VALINES. After UC-1430's arrival to the block, he/she engaged with VALINES, who was seated in the driver seat of **SUBJECT VEHICLE 2**. After engaging in a CDS related conversation, VALINES then sold UC-1430, twelve gold tip vials containing cocaine, in exchange for $240. Investigators had observed no prior CDS activity in the block, until VALINES arrived in **SUBJECT VEHICLE 2**, which leads investigators to believe that VALINES brought a supply of CDS to the DTO, to be distributed on the street-level.

## I.    Black Nissan Altima bearing a Maryland license plate 3EF9143 (SUBJECT VEHICLE 3)

55.    **SUBJECT VEHICLE 3** is registered to Sandra Wallace, and is being used by Shawn SMITH to traffic and store CDS for the DTO to be distributed on the street-level. For the reasons fully detailed above, investigators have routinely observed SMITH use **SUBJECT VEHICLE 3** to store suspected CDS in the vehicle's wheel well that he later distributes on the street-level to buyers. More recently, on January 14, 2021, investigators were conducting

observations of SMITH, when he was observed transporting CDS from **SUBJECT PREMISES 6** to the DTO, as described above. SMITH was then observed numerous times distributing CDS from the wheel well area of **SUBJECT VEHICLE 3** to paying customers.

## V.   CONCLUSION

56.    Based on the foregoing affidavit, it is respectfully submitted that there is probable cause to believe that MADISON (a) distributed and possessed with the intent to distribute 40 grams or more of a mixture or substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 841(b)(1)(B); and (b) conspired to distribute controlled substances in violation of 21 U.S.C. § 846. It is further submitted that there is probable cause to believe that the **SUBJECT PREMISES** and the **SUBJECT VEHICLES** are being used for the storage and distribution of narcotics, narcotics proceeds, narcotics related documents, and the facilitation of narcotics offenses in violation of 21 U.S.C. §§ 841 and 846; and that there will be found in the **SUBJECT PREMISES** and the **SUBJECT VEHICLES** evidence, fruits, and instrumentalities of the aforementioned violations.

WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue an arrest warrant for MADISON and search warrants for the **SUBJECT PREMISES** and **SUBJECT VEHICLES** more fully described in Attachments A, and authorize the search and seizure of the items described in Attachment B.

Task Force Officer Keith A. Galeano
Drug Enforcement Administration

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41 this _2_ day of February, 2021.

The Hon. Thomas M. DiGirolamo
United States Magistrate Judge